UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SERGIO GUARNERO-RUIZ,
FLORENCIO ROMERO,
OSCAR BARRON,
GUADALUPE GARCIA,
HUGO HERNANDEZ,

                        Plaintiffs,

            -against-                             **REPORT AND**
                                                  **RECOMMENDATION**
                                                  17-CV-3178-LDH-SJB

36-03 FOOD, LLC,
THEODORE KARAGIANNIS,
ALEJANDRO GALICIA,
FERNANDO CASTELAN-GONZALEZ,

                        Defendants.
-----------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

      This case was initiated by three plaintiffs—Sergio Guarnero-Ruiz, Florencio Romero and Oscar Barron—against a number of defendants, alleging violations of the Fair Labor Standards Act and New York Labor Law.[1] On October 4, 2017, attorneys Justin Cilenti, on behalf of all Plaintiffs, and Michael P. Giampilis, on behalf of all Defendants, filed a "Stipulation of Dismissal Solely" as to Plaintiff Romero. The Honorable LaShann DeArcy Hall referred the stipulation to the undersigned for a review pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015). For the reasons explained below, the Court respectfully recommends that the stipulation be rejected and Mr. Romero not be dismissed as a plaintiff from the case.

---

[1] Subsequent to the filing of the Complaint, plaintiffs Guadalupe Garcia and Hugo Hernandez were joined on November 16, 2017. (*See* Dkt. Nos. 20-21).

1

Procedural History and Factual Background

The procedural history and factual background of this case are relevant to this Court's recommendation, and are therefore described in greater detail than otherwise might be necessary.

A. Filing of the Complaint

On April 26, 2017, Mr. Guarnero-Ruiz and Mr. Romero retained the firm of Cilenti & Cooper, PLLC.  (Nov. 8, 2017 Letter Regarding *Cheeks* Review submitted by Plaintiffs ("Nov. 8 Ltr.") at 1 (Dkt. No. 19)).  Mr. Barron retained the firm on May 10, 2017.  (Nov. 8 Ltr., 1 n.1).  On May 25, 2017, these Plaintiffs filed a complaint against defendant 36-03 Food, LLC ("Create") and three individual defendants Fernando Castelan-Gonzalez, Alejandro Galicia and Theodore Karagiannis.  (*See* "Compl." (Dkt. No. 1)).  The Complaint attached as exhibits forms entitled "Consent to Sue under Fair Labor Standards Act."  Each plaintiff personally signed a form which stated "[I am] an employee currently or formerly employed by Create and Go, and/or related entities.  I consent to be a plaintiff in the above-captioned action to collect unpaid wages."  Mr. Guarnero-Ruiz and Mr. Romero's consent forms were dated April 26, 2017, and Mr. Barron's was dated May 10, 2017.

The Complaint alleges that Defendants own or operate a restaurant in Astoria, Queens, called Create.  (Compl. ¶¶ 7-10).  Defendant Theodore Karagiannnis is the owner, officer, director, supervisor, managing agent, and proprietor of Create.  (Compl. ¶ 8).  Defendant Alejandro Galicia is the general manager of Create.  (Compl. ¶ 9).  Defendant Fernando Castelan-Gonzalez is its manager and supervisor.  (Compl. ¶ 10).

Plaintiffs were employed at Create.  Mr. Guarnero-Ruiz was a food delivery worker, dishwasher, food preparer/kitchen helper, stock person, and porter from about

January 2015 until the present. (Compl. ¶ 13). Mr. Romero was similarly employed from about September 2014 until the present. (Compl. ¶ 14). Mr. Barron was also similarly employed from about January 2013 until January 2015 and from January 2017 until April 2017. (Compl. ¶ 15).

Plaintiffs seek to recover from Defendants, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 et seq. ("FLSA"): (a) unpaid minimum wages, (b) unpaid overtime compensation, (c) liquidated damages, (d) prejudgment and post-judgment interest, and (e) attorneys' fees and costs. (Compl. ¶ 1). They also seek to recover from Defendants, pursuant to New York Labor Law § 2: (a) unpaid minimum wages, (b) unpaid overtime compensation, (c) unpaid "spread of hours" premium for each day they worked a shift in excess of ten (10) hours, (d) misappropriated tips, (e) liquidated damages and civil penalties pursuant to the New York Labor Law and the New York State Wage Theft Prevention Act, (f) prejudgment and post-judgment interest, and (g) attorneys' fees and costs. (Compl. ¶ 2).

Mr. Romero's alleged recovery, including wages, overtime compensation, tips, and liquidated damages, exceeds $60,000. (Transcript of Proceedings held on November 13, 2017 ("Tr.") at 29:5-20).

B. Post-Complaint Activity

1. The June Release and Settlement Agreement

On June 16, 2017, Mr. Guarnero-Ruiz and Mr. Romero signed and notarized separate but identical documents entitled "Confidential Release and Covenant Not to

3

Sue" (the "Release").² Defendants' signatures do not appear on either of the two submitted Releases—one Release is signed by Mr. Guarnero-Ruiz, and the other by Mr. Romero.

Mr. Romero does not speak or understand English. (Tr. at 20:9-10). His "boss," whom he did not identify, delivered the Release to Mr. Romero. (Tr. at 22:25-23:5). Mr. Romero signed the agreement in the presence of Mr. Guarnero-Ruiz, a notary, and another co-worker. (Tr. at 21:16-22). His boss was not present. (Tr. at 22:25-23:5). The co-worker, whom Mr. Romero did not identify, provided him with an oral translation of the Release, which took about 10-15 minutes to deliver. The co-worker read the agreement in English first, and then explained what it meant to the Plaintiff. (Tr. at 21:25-22:12).³ No lawyers were present at the signing. (Tr. at 21:23-24, 23:15-17). It was his boss who delivered the agreement to Mr. Romero, and the agreement was possibly prepared by the boss's attorney. (Tr. at 21:1-8, 22:19-24, 23:6-14).⁴ His boss knew that Mr. Romero and other employees had retained counsel. (Tr. at 31:7-10).

---

² The Release was filed with the Court on November 8, 2017, by Mr. Cilenti in response to the Court's order requesting briefing on whether *Cheeks* review was required. (*See* Letter Regarding Cheeks Review (Dkt. No. 19)).

³ It does not appear Mr. Romero was given a line-by-line translation. (Tr. at 22:8-12 (The Court: "Okay. Did she translate it line by line or just give you a general sense of what the agreement was about?" Mr. Romero: "She read it first in English and then *she explained to us what it all meant*.") (emphasis added)).

⁴ At one point Mr. Romero asked the Court, "Is this the agreement that we got from the boss's lawyer?," which suggests that a lawyer—not counsel who have appeared in this case—was assisting Mr. Romero's boss prepare the Release and provided it directly to Mr. Romero. (Tr. at 21:7-8; *see also* Tr. at 22:19-24 (The Court: "Who gave you this agreement?" Mr. Romero: "Well, I am not sure. She handed us the document. Perhaps the attorney." The Court: "So which attorney?" Mr. Romero: "I'm not sure. Perhaps my boss' attorney."); Tr. at 23:7-10 ("Are you aware of him having a lawyer?" A: "I suppose, yes. When he asked us to sign, he said he had an attorney because he said he needed to speak with his attorney.")).

4

In return for signing the agreement, both Mr. Guarnero-Ruiz and Mr. Romero received $4,000. The Release provided that each "irrevocably and unconditionally releases and forever discharges" Defendants:

> from *any and all actions* pending, causes of action, charges, complaints, *claims, and liabilities of any kind whatsoever, known or unknown*, suspected or unsuspected (hereinafter referred to as "claim" or "claims") which Releasor at any time has, had or claimed to have against Releasees regarding events that have occurred up to the execution of this Confidential Release and Covenant Not to Sue (the "Release"), *including, without limitation, any and all claims related or in any manner incidental to Releasor's employment or termination, or any liability under any contract, tort, federal, state or local fair employment practices or civil rights or any other law, including, but not limited to*, the New York State Human Rights Law, New York City Human Rights Law, Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act, COBRA, the Family and Medical Leave Act, the Fair Labor Standards Act, New York State Labor Law, New York City Labor Law, *or any and all common law claims,* including claims for wrongful discharge, breach of express or implied contract, breach of an implied covenant of good faith and fair dealing, violation of public policy, defamation or misrepresentation, *or any claim for attorneys' fees, physical or emotional distress or injuries, punitive damages, compensatory damages, or any other duty or obligation of any kind or description whether arising in law or equity,* except for claims to enforce this Release. . . .

(Release at ¶ 1) (emphasis added).

The Release appears to be a form document; the $4,000 amount was filled in on a blank space. (Release at ¶ 1). Regardless of what is filled in the blank, the Release provides that the signatory "specifically acknowledges that this Release, and the monies received by Releasor . . . are a fair and reasonable resolution for any bona fide dispute" under the FLSA or New York Labor Law, and for all time the employee worked up until the date of the agreement. (Release at ¶ 1).

The Release goes on to provide that Mr. Romero "promises not to sue" the Defendants and to "discontinue any ongoing litigation" against them. (Release at ¶ 2).

5

If Mr. Romero were to commence "any such legal action" that he has released, he will be required to indemnify Defendants for fees and costs in defending that action. Mr. Romero is also required to keep the agreement confidential. (Release at ¶ 3).

Mr. Romero described what he believed he was giving up by signing the Release: "What I understand, as was explained to me, is that we have certain rights, certain rights to sue, certain rights to make more than what I was given." (Tr. at 25:14-20). When asked what he understood he was receiving, he said, "Not much but I understood what I was being given and I left satisfied. And because I was going to leave, I was in agreement." (Tr. at 25:21-25).[5]

At the time they signed the agreements on July 26, both Mr. Guarnero-Ruiz and Mr. Romero were represented by Mr. Cilenti. Defendants had been served with the Complaint some 12 days earlier on July 14; the Complaint states that Mr. Cilenti represents both Mr. Guarnero-Ruiz and Mr. Romero. (*See* Dkt. Nos. 4-8). Mr. Cilenti, however, was not present at the signing of the settlement agreement, did not draft the document, and did not advise either Mr. Guarnero-Ruiz or Mr. Romero about whether to sign the agreement. (Tr. at 23:15-17). The same was true for Defendants' counsel, Mr. Giampilis. (Tr. at 18:23 ("I found out after the fact.")). The Release was "conducted without the knowledge of" either Mr. Cilenti or Mr. Giampilis. (Oct. 23, 2017 Mot. to Adjourn Conference ("Oct. 23 Mot.") at 1 (Dkt. No. 18)).

Mr. Romero and Mr. Guarnero-Ruiz were also given a letter, dated June 16, 2017, the same date as the Release, by their boss. (Tr. at 24:7-17). Mr. Romero signed the

---

[5] Mr. Romero intended to "leave" by returning to Mexico. He subsequently changed his mind, because his family circumstances had changed. (Tr. at 23:18-25).

letter on June 20, after receiving $4,000. (Tr. at 24:25-25:10). When Mr. Romero signed the letter, Mr. Cilenti was not present. Only a notary and the female co-worker who acted as a translator were present. (Tr. at 22:18-24). The letter, which was addressed to Mr. Cilenti stated:

> I no longer wish to participate in this lawsuit. Please stop all work on this case and file the appropriate papers with the Court stopping this action and withdrawing as my lawyer. I no longer need you as my lawyer. If you don't do so I will notify the Court myself.

(Nov. 8 Ltr., Ex. A). The letter was in English, followed by a written Spanish translation. Mr. Guarnero-Ruiz also signed an identical letter on the same day. (Nov. 8 Ltr., Ex. B).

After Mr. Cilenti learned about the Release, he had a series of conversations with Mr. Romero. Mr. Cilenti informed Mr. Romero that his firm "did not believe [the Release] to be a fair resolution of his unpaid wage claim," and also informed him, in person, that he could still continue to participate in the case. (Oct. 23 Mot. at 1; Tr. at 9:9:13). Mr. Romero told Mr. Cilenti that he wished to continue to participate in the case, but then changed his mind, and again told Mr. Cilenti he no longer wished to move forward with his lawsuit. (Tr. at 9:14-17). Mr. Romero said that he never told Mr. Cilenti he wanted to re-initiate his lawsuit. (Tr. at 26:6-10). Mr. Cilenti had a similar conversation with Mr. Guarnero-Ruiz, who agreed to continue with his lawsuit, and a stipulation of dismissal has not been filed with respect to Mr. Guarnero-Ruiz. (Tr. at 10:20-23).

2. The Stipulation

A stipulation of dismissal as to Mr. Romero was filed on October 16, 2017 (Dkt. No. 16), which provides that:

> It is hereby stipulated and agreed, by and through counsel for the undersigned parties that the claims of plaintiff Florencio Romero shall be,

7

and hereby are, dismissed without prejudice and without costs or attorneys' fees against any party.

The document was signed by Mr. Cilenti as "Attorney for Plaintiffs" and Mr. Giampilis as "Attorney for Defendants." Underneath their signatures are the words "So ordered" with a blank signature line for "Hon. LaShann DeArcy Hall, U.S.D.J."

District Judge DeArcy Hall referred the stipulation for a report and recommendation to the undersigned on October 17, 2017. That same day this Court issued an order scheduling a *Cheeks* hearing. On October 23, 2017, Mr. Cilenti filed a motion on behalf of Plaintiffs to "adjourn the conference *sine die*," stating that "because the dismissal is without prejudice, it is not subject to approval under *Cheeks*." Mr. Cilenti also stated that:

> We continue to maintain our position that the payment to Mr. Romero does not constitute a fair and reasonable resolution to his claims[—]not only in terms of the amount of the payment, but also because the agreement was not negotiated at arm's length but, rather, due to the employer's overreaching. Consequently, we cannot argue that any such private agreement between the defendants and Mr. Romero is fair pursuant to *Cheeks*.

(Oct. 23 Mot. at 1).

The motion was denied on October 25, 2017. The Court directed the parties to be prepared to discuss at the hearing the question of whether dismissals pursuant to Rule 41(a)(1)(A) in an FLSA case require court supervision, and were invited to submit legal briefs on the question.

Mr. Cilenti, on behalf of Plaintiffs, reiterated his prior positions in a November 8, 2017 letter, and described the Release as follows:

> This was a private negotiation solely between the parties without the knowledge or input of counsel. We believe that this is a clear situation of overreaching on behalf of defendants, who offered a nominal amount of money and the promised of continued employment in exchange for a

8

> dismissal of Mr. Romero's claims. This uneven bargaining power between employers and employees, which often leads to unfair agreements is the exact reason why settlements under the FLSA are required to be approved by the courts in the first place. If this is not the type of overreaching that the statute is intended to prevent, it is not clear what would be.

(Nov. 8 Ltr. at 4). He asked that Mr. Romero's claims be dismissed without prejudice via stipulation. (Nov. 8 Ltr. at 4). The letter asserted that *Cheeks* review was not required. (Nov. 8 Ltr. at 2-3). Defendants did not file a brief.

A hearing was held on November 13, 2017, with Mr. Cilenti and Mr. Giampilis, as well as Mr. Romero present.

## Discussion

### I. The Stipulation Should Be Rejected

At this stage of the case—after Defendants have answered—Rule 41 ("Dismissal of Actions") provides two means of voluntarily dismissing an action against a defendant. First, under Rule 41(a)(1)(A)(ii), a plaintiff "may dismiss an action without a court order by filing" "a stipulation of dismissal signed by all parties who have appeared." Second, under Rule 41(a)(2), "at the plaintiff's request" and "only by court order" and on terms "that the court considers proper," an action may be dismissed.

The Stipulation filed with the Court is silent, and makes no mention of either Rule 41(a)(1)(A)(ii) or Rule 41(a)(2). The distinction is significant. A Rule 41(a)(1)(A)(ii) dismissal may be done by stipulation; the dismissal, almost always, is effective by the filing of the document; the Court has no involvement, and need not approve it. *See Torres v. Walker*, 356 F.3d 238, 243 (2d Cir. 2004) ("The stipulation of dismissal was entered pursuant to Fed. R. Civ. P. 41(a)(1)[A](ii), and thus did not even require the approval of the District Court."). *See also Li Rong Gao v. Perfect Team Corp.*, 249 F. Supp. 3d 636, 638 (E.D.N.Y. 2017) ("In most circumstances, under Rule

9

41(a)(1)(A)(ii), litigants do not need a court order to dismiss, with the consent of all parties, a plaintiff's claims against all or some defendants."). The only requirements are that the stipulation be "signed by all parties who have appeared" in the action and that it comply with the requirements of "any applicable federal statute" (or Rule 23 in a case involving a class action, and Rule 66 in a case involving a receiver). Fed. R. Civ. P. 41(a)(1)(A)(ii). And unless it states otherwise, the dismissal is *without prejudice. See* Fed. R. Civ. P. 41(a)(1)(B). In contrast, a Rule 41(a)(2) dismissal, which is made at the "plaintiff's request," requires court approval. It is not a dismissal as of right. And court approval must be on terms that "the court considers proper." *See, e.g., Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990). The dismissal, like a 41(a)(1)(A)(ii) dismissal, is *without prejudice,* unless the request states otherwise. *See Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 425 F.3d 207, 211 (2d Cir. 2005).

A hearing regarding the stipulation was scheduled for November 13, 2017. In attempting to adjourn the hearing, Mr. Cilenti asked "that the Court *enter* the Stipulation and Order of Dismissal." (Oct. 23 Mot. at 2) (emphasis added). In response to the order denying the adjournment, Mr. Cilenti filed a letter asking the Court to "dismiss Mr. Romero's claims without prejudice." (Nov. 8 Ltr. at 1, 4). These statements—along with the signature line in the Stipulation for District Judge DeArcy Hall—suggested that the parties were asking that some Court action be taken to effect the dismissal. That is, it appeared to be a Rule 41(a)(2) dismissal request, not a Rule 41(a)(1)(A)(ii) dismissal, which does not require any court involvement.

But at the hearing, when the Court noted that if this were a Rule 41(a)(2) dismissal, it would be subject to court approval, both parties said it was not such a dismissal. (Tr. at 3:8-19 (The Court: "Well, let me be clear, (a)(1)(A)[(i)] allows you to

10

dismiss as of right, before an answer is filed. You may also dismiss as of right if you're the plaintiff, if you get a stipulation signed by all parties who have appeared. And then there's an (a)(2) dismissal which requires a court order." Mr. Cilenti: "So my position as counsel for plaintiff would be that it falls under the second subsection (a)[(1)] where it doesn't require – it's a stipulation on behalf of all parties that doesn't require court approval.")). And as to the signature line for Judge DeArcy Hall, it was described as an "oversight" by "both parties." (Tr. at 7:5-7).

The parties' statements at the hearing suggested that they intended to dismiss Mr. Romero, without court action, notwithstanding the signature block for Judge DeArcy Hall. They also offered to withdraw the stipulation and simply refile one without a signature block. (Tr. at 35:24-36:4). As such, this Court is treating the stipulation as a Rule 41(a)(1)(A)(ii) stipulation. *See Hester Indus., Inc. v. Tyson Foods, Inc.*, 160 F.3d 911, 916 (2d Cir. 1998) ("Because all of the parties stipulated to dismissal in the underlying action, the dismissal of the case was . . . not by order of the district court."). And the "judge's signature" block "on the stipulation did not change the nature of the dismissal." *Id.*

However, this Court respectfully recommends that the stipulation be rejected.

The document is not what it purports to be. The stipulation submitted to the Court states that it dismisses Mr. Romero's claims without prejudice. A dismissal without prejudice contemplates that there is some possibility that a suit could be filed again. 8 James WM. Moore et al., *Moore's Federal Practice* § 41.11 (3d ed. 2017) ("[M]ost voluntary dismissals do not actually terminate the litigation, but result in their renewal at another time and place. This phenomenon is anticipated and encouraged by Rule 41(a) which provides that a voluntary dismissal . . . will be without prejudice to

11

further litigation."). The parties would have the Court operate under a fiction that there is some possibility that the case could be brought again.

There is no such possibility. Mr. Romero has agreed to forever discharge the claims against Defendants. He has promised never to sue Defendants, to discontinue any litigation related to the claims in the case, and to indemnify Defendants should he choose to sue again. There is no phoenix that will rise from the ashes. Mr. Romero's case will never be resuscitated, and if he tried to do so, Defendants have made clear that they will attempt to invoke the Release against him. (Tr. at 16:18-20 (Mr. Giampilis: "I think in this instance, that if you do sign off on the stipulation without prejudice, I think the settlement agreement still survives[.]"); Tr. at 16:25-17:8 (The Court: "But it would be certainly your position that if I recommend and Judge DeArcy Hall signs off, without doing a *Cheeks* review . . . it would be your position that the settlement agreement survives, at least until it's litigated." Mr. Giampilis: "Absolutely."); Tr. at 39:2-8 ("I would obviously make a motion to dismiss . . . [o]n the basis of the agreement.")).

This fiction is hoisted on the Court in order to avoid the fairness review required by *Cheeks*. (Oct. 23 Mot. at 2 ("[B]ecause the dismissal is without prejudice, it is not subject to approval under *Cheeks*."); Nov. 8 Ltr. at 1 ("It is plaintiffs' position that judicial approval is not required."); *see also* Tr. at 16:15-17:18). Under *Cheeks*, a "with prejudice" dismissal of FLSA claims requires Court approval. *Cheeks*, 796 F.3d at 206 ("Rule 41(a)(1)(A)(ii) stipulated dismissal settling FLSA claims with prejudice require the approval of the district court or the DOL to take effect."). Counsel for both sides have framed the issue before the Court as the one reserved for a later day in *Cheeks*, *i.e.* whether a without prejudice stipulation in a FLSA case requires court approval. *Id.* at 201 n.2 ("[W]e leave for another day the question of whether parties may settle such

12

cases without court cases without court approval or DOL supervision by entering into a Rule 41(a)(1)(A) stipulation without prejudice."); (Tr. at 12:20-13:2; Nov. 8 Ltr. at 2-3).

In *Cheeks*, the settlement agreement was not before either the District Court or the Second Circuit. 796 F.3d at 201 ("Rather than disclose the terms of their settlement, the parties instead asked the district court to stay further proceedings and to certify . . . the question."). The result of *Cheeks* was that the parties, on remand, were ordered to place the settlement agreement on the record and have the Court evaluate it. *Id.* at 200-1, 207. Perhaps a fairness review would not be appropriate where a without prejudice stipulation is all the Court has before it.

But that is not this case. What is before this Court is a dismissal of FLSA claims with prejudice masquerading as a stipulation of dismissal without prejudice. The Court has here before it the actual settlement agreement, and is asked to pretend it does not exist. The Release is an unequivocal one: all claims in this case (and many, if not all, other claims that Mr. Romero could ever bring against Defendants) are released; he has promised never to sue, to discontinue all lawsuits, and pay Defendants theirs costs and fees should he design to change his mind. Such is not a dismissal without prejudice. *Seck v. Dipna Rx, Inc.*, No. 16-CV-7262, 2017 WL 1906887, at *1 (S.D.N.Y. May 8, 2017) ("A true dismissal without prejudice would permit the plaintiff to reassert his claims. But, here, the dismissal without prejudice coupled with the terms of a settlement agreement foreclose [plaintiff] from ever asserting his FLSA claim.").[6]

---

[6] Counsel suggested some other reasons why *Cheeks* review was not required under this without prejudice stipulation. One is that the case "wasn't truly settled in the true sense of an FLSA settlement." (Tr. at 6:1-3). It may be—as Mr. Cilenti, to his credit, readily agrees—the settlement runs counter to any appropriate FLSA settlement. But that is not a reason that it does not require court approval; quite to the contrary, because Mr. Romero's FLSA claims are being released under dubious circumstances, it

13

So the issue before the Court is not the one reserved in *Cheeks* by the Second Circuit. Rather, the question is whether this Court may, based on a settlement agreement, look behind a "without prejudice" stipulation, and reject it.[7]

A court's ability to do so, and defeat the self-executing nature of a Rule 41(a)(1)(A)(ii) stipulation, is an exercise of its ancillary jurisdiction. At its core, ancillary

---

is a reason why Court approval might be necessary. Counsel also suggested that the stipulation "dismisses Mr. Romero's claims without prejudice so as to protect Mr. Romero's right to commence suit in the future if he wishes to do so." (Oct. 23 Mot. at 2). There is no such right by virtue of the Release. To the extent counsel is suggesting that if a plaintiff signs an agreement waiving his FLSA rights, and in a subsequent proceeding, the agreement can be undone because it is unfair or violates the FLSA, no authority stands for that proposition. *See Carson v. Team Brown Consulting, Inc.*, No. 16-CV-4206, 2017 WL 4357393, at *2 (E.D.N.Y. Sept. 29, 2017) ("Plaintiff's counsel maintains that the Court need not be concerned with this potentiality because the release could later be deemed unenforceable as a matter of law. The Court does not derive comfort from that possibility.") (citations omitted). The problems with such an approach, in any event, are manifold. The Release, by evading *Cheeks* review, places Mr. Romero in legal jeopardy that he did not have before—the subsequent lawsuit would place him at risk of paying his employer's legal fees and costs. And to the extent that the FLSA waiver could be undone, nothing suggests that the waiver of his other rights and claims could be unwound, including his New York State labor law claims. *See Carson*, 2017 WL 4357393, at *2 ("[A]bsent judicial scrutiny, an overboard release potentially of the sort decried by the court in *Cheeks* would remain in this settlement agreement. The Court cannot abide by such an outcome.").

[7] The procedural history of this case may be a reason why the question reserved in *Cheeks* should be resolved in the affirmative. Had the matter not been referred by District Judge DeArcy Hall for a *Cheeks* review, and had this Court not directed the parties to brief whether *Cheeks* review was required, the Release would never have come to light. Following the referral, and after this Court's setting a hearing date, plaintiffs filed a request that "the fairness hearing be adjourned" without a date, and the Court dismiss Mr. Romero's claims without prejudice. It was only after that request was denied, and the parties ordered to brief the *Cheeks* issue, that the Release was filed before the Court. Not requiring *Cheeks* review in a without prejudice dismissal, as the District Judge here did require, would permit a result that is certainly contrary to the FLSA. Parties could craft a settlement agreement identical to the Release, not file it with the Court, and counsel would only have to engage in the ministerial act of filing a Rule 41(a)(1)(A)(ii) stipulation. And the plainly problematic Release, which flunks even the most basic fairness test, signed under dubious circumstances, would not have come to light.

14

jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) . . . incidental to other matters properly before them." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 378 (1994). To that end, a court may exercise its ancillary jurisdiction "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."[8] *Id.*; *see also United States v. Field*, 193 F.2d 92, 96 (2d Cir. 1951) ("[I]t is fundamental that federal courts . . . have inherent power to do all things that are reasonably necessary for the administration of justice[.]"). This ancillary jurisdiction is referred alternatively as part of the court's "inherent power." *Kokkonen*, 511 U.S. at 378; *Gumbel v. Pitkin*, 124 U.S. 131, 145-46 (1888) ("[T]he equitable powers of the courts of the United States, sitting as courts of law, over their own process, to prevent abuse, oppression, and injustice, are inherent, and as extensive and efficient as may be required by the necessity for their exercise[.]").

For the District Court to reject the without prejudice stipulation would be an exercise of its inherent power, akin to what the Second Circuit authorized in *Thomsen v. Terrace Navigation Corporation*.[9] There, before the District Court, plaintiff's counsel

---

[8] The other form of ancillary jurisdiction—"to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent," *Kokkonen*, 511 U.S. at 379—is not relevant to this case.

[9] This Court cannot recommend that the stipulation be changed to a with prejudice stipulation and then have the agreement reviewed under Cheeks. Changing a Rule 41(a)(1)(A)(ii) stipulation to dismiss with prejudice is beyond a district court's inherent authority. *See In re Wolf*, 842 F.2d 464, 466 (D.C. Cir. 1988). *See also Hester Indus., Inc.*, 160 F.3d at 916 ("Because the dismissal was effectuated by stipulation of the parties, the court lacked the authority to condition dismissal . . . ."). It would be proper, however, for a Rule 41(a)(2) dismissal, but that is not what has been filed. *Gravatt v. Columbia Univ.*, 845 F.2d 54, 56 (2d Cir. 1988) ("a district judge may convert a dismissal sought to be entered without prejudice to one with prejudice" brought under Rule 41(a)(2)).

15

indicated that a settlement had been reached with the defendant; the court entered an order of voluntary discontinuance. 490 F.2d 88, 89 (2d Cir. 1974) (per curiam). The plaintiff himself moved to vacate the discontinuance, because his lawyer had settled the case without his consent. *Id.* The District Court denied the motion, believing that the order closing the case deprived it of any authority to do so. *Id.* This was despite the District Court's clear discomfort with the course of events. *Id.* The Second Circuit reversed, holding that the District Court should have vacated the order closing the case, and do so on the basis of its "inherent power." *Id.*

In *Thomsen*, the parties' voluntary discontinuance should have been rejected by the District Court, which had concluded that the dismissal did not reflect the true state of events before it. That is no different than rejecting a without prejudice dismissal, in the face of evidence that it is not, in fact, reflective of the facts before the District Court. Both are exercises of a court's inherent power.

"While a properly stipulated dismissal under Rule 41(a)(1)[(A)](ii) is self-executing and does not require judicial approval, a court may decline to permit a voluntary dismissal when required to avoid short-circuiting the judicial process, or to safeguard interests of person entitled to the court's special protection." *Green v. Nevers*, 111 F.3d 1295, 1301 (6th Cir. 1997) (citations omitted); *see also* Moore et al., § 41.32[4] ("[T]he court may look behind the stipulation to determine whether the stipulation is . . . meant to facilitate a secret decree.") (discussing stipulation look-behind in the context of the Tunney Act). Only "[g]enerally" does a "plaintiff's filing in district court of a stipulation of dismissal signed by all parties . . . divest[] the court of its jurisdiction over a case[.]" *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 139 (2d Cir. 2004) (emphasis added); *see e.g.*, *United States v. Mercedes-Benz of North Am.*, 547 F.

16

Supp. 399, 400 (N.D. Cal. 1982) ("[T]he court, exercising its inherent powers, may look behind [a stipulation of dismissal] to determine whether there is collusion or other improper conduct giving rise to dismissal," and finding it "appropriate and within this court's power to look behind . . . to determine whether there is any settlement, agreement, or understanding between the parties."); *Green v. Nevers,* No. 92-CV-76881, 1993 WL 1620511, at *13 (E.D. Mich. Apr. 13, 1993) ("[E]ven if the . . . stipulated dismissal had been properly executed, this Court, in the exercise of its inherent power to act to prevent abuse of the judicial process, would nonetheless order that the dismissal be set aside.").

*Cheeks* requires District Courts to subject with prejudice dismissals of FLSA cases to fairness review. The parties here have opted to file a without prejudice dismissal to avoid the *Cheeks* review that would accompany a with prejudice dismissal; and they are doing so even though their clients have executed a with prejudice resolution that would necessitate such review. This stipulation's effect is to "short-circuit" the judicial process required by *Cheeks*. *See Seck*, 2017 WL 1906887, at *2 (rejecting without prejudice stipulation, because "in the context of *Cheeks* . . . [a] settlement containing a release that extinguishes the right to bring a claim in the future forecloses the claim as certainly as a stipulation of dismissal with prejudice.").

Allowing this without prejudice dismissal would undermine the Second Circuit's *Cheeks* directive that with prejudice dismissals require scrutiny of settlement agreements. And in other cases, to avoid *Cheeks*, parties could file stipulations containing without prejudice language, even if there is a settlement agreement providing otherwise. The Court's inherent power exists to protect the judicial process and prevent such a result. *See Green*, 111 F.3d at 1301 (upholding District Court's exercise of its

17

"broad discretion" and "inherent power" to reject a self-executing stipulation, where settlements of state wrongful death lawsuits required court approval, and parties had submitted stipulation of dismissal to avoid court review of agreement). It may be that counsel have sound reasons to argue that a settlement agreement followed by a without prejudice dismissal should not be subject to fairness review. Those reasons are presumably why after the Court raised questions about the nature of the dismissal—and stated that a Rule 41(a)(2) dismissal would subject it to court review—did the parties change course and suggest this was an automatic Rule 41(a)(1)(A)(ii) dismissal. Whatever those reasons may be, the vehicle to litigate that question should not have been this case, where there is no true without prejudice dismissal.

The Court's inherent power also may be exercised to "safeguard interests of persons entitled to the court's special protection." *Green*, 111 F.3d at 1301. That power has been exercised to protect *minor children*, *e.g. id.*, and incompetent adults, *e.g. Weaver v. New York City Employees' Ret. Sys.*, No. 88-CV-2662, 1988 WL 85480, at *1 (S.D.N.Y. Aug. 11, 1988). Those protections often arise via statutory obligation. *Green*, 111 F.3d at 1301. The class of persons entitled to the court's "special protection" extends to the workers protected by the FLSA. The "FLSA is a uniquely protective statute" whose "remedial purpose" is to "prevent abuses by unscrupulous employers, and remedy the disparate bargaining power between employers and employees." 796 F.3d at 207. And the clear mandate of *Cheeks* is to have courts scrutinize settlement agreements that forever dispose of a worker's claims, because the FLSA demands their protection from certain invidious conduct.

Whatever the outer boundaries of this class of protectees may be, Mr. Romero's case does not test those limits. Mr. Romero has signed an agreement that Plaintiffs'

18

counsel believes is coercive and improper, and Defendants' counsel admits contains waivers he has never seen approved by any court.  (*See* Nov. 8 Ltr. at 4 ("[W]e cannot in good conscience stand before this Court and argue or concede[] that the private agreement reached between Mr. Romero and the defendants is fair and reasonable under *Cheeks*."); Tr. at 27:19-21 (Court: "[W]hat court are you aware of ever approving a stipulation that broad?"  Mr. Giampilis: "I am not aware.")).  Mr. Romero has bargained away a potential $60,000 claim for $4,000.  He did so, after he had hired a lawyer to prosecute a lawsuit, but without that lawyer's advice and counsel.  His boss, after being served with the lawsuit, presented Mr. Romero, whom he knew to be represented, with form fill-in-the blank documents in English, which is not Mr. Romero's first language.  And his boss then proceeded to give Mr. Romero a letter firing his lawyer.  Under the light of the Court's inquiry, Mr. Romero's agreement would fail even the most basic review for fairness.  As Mr. Cilenti aptly observed, "[i]f this is not the type of overreaching that the statute is intended to prevent, it is not clear what would be."[10] (Nov. 8 Ltr. at 4).  The Court's inherent power—as informed by the FLSA and *Cheeks*— may be exercised for the statute's protectees, and permit a court to look behind a without prejudice stipulation and reject it.[11]

---

[10] As the Second Circuit explained, articulating a rationale for *Cheeks*: "'Low wage employees . . . often face extenuating economic and social circumstances and lack equal bargaining power; therefore, they are more susceptible to coercion or more likely to accept unreasonable, discounted settlement offers quickly.  In recognition of this problem, the FLSA is distinct from all other employment statutes.'"  *Cheeks*, 796 F.3d at 205 (quoting *Socias v. Vornado Realty L.P.*, 297 F.R.D. 38, 40 (E.D.N.Y. 2014).  The Court was presaging a case like Mr. Romero's.

[11] Although Mr. Cilenti was relieved as counsel by Mr. Romero, Mr. Romero's letter to Mr. Cilenti did indicate that Mr. Romero wished Mr. Cilenti to file necessary paperwork to end the lawsuit.  (Nov. 8 Ltr., Ex. A).  Mr. Cilenti did, therefore, have authority to seek dismissal of the lawsuit.

Conclusion

For the reasons explained above, the Court respectfully recommends to the Honorable District Judge that the stipulation without prejudice (Dkt No. 16) be rejected.

Any objections to the recommendations made in this Report must be made within fourteen days after filing of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

s/ _____
SANKET J. BULSARA
United States Magistrate Judge

December 11, 2017
Brooklyn, New York